UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Helidoro S. GONZALES,<br><br>                              Plaintiff,<br><br>v.<br><br>Raymond MADDEN, et al.,<br><br>                              Defendants. | Case No.:  23-cv-2181-AGS-BJC<br><br>**ORDER:<br>(1) GRANTING IN FORMA PAUPERIS MOTION (ECF 2);<br>(2) SCREENING AND DISMISSING IN PART COMPLAINT (ECF 1);<br>(3) DENYING AS MOOT MOTION TO CORRECT (ECF 4); AND<br>(4) GRANTING LEAVE TO FILE EXCESS PAGES (ECF 5)** |

In this civil-rights action under 42 U.S.C. § 1983, inmate Helidoro Gonzales alleges that his Eighth Amendment rights were violated when prison employees were deliberately indifferent to his serious medical needs and used excessive force against him. (*See* ECF 1, at 5–20.) For the reasons below, the Court grants Gonzales's motion to proceed in forma pauperis and dismisses some of his claims with leave to amend.

**MOTION TO PROCEED IN FORMA PAUPERIS**

Parties instituting most civil actions in federal court must pay a filing fee of $402.[1] *See* 28 U.S.C. § 1914(a). A party may initiate a civil action without prepaying the required filing fee if the Court grants leave to proceed in forma pauperis. *See* 28 U.S.C. § 1915(a); *Andrews v. Cervantes*, 493 F.3d 1047, 1051 (9th Cir. 2007).

To proceed IFP, plaintiffs must establish their inability to pay by filing an affidavit regarding their income and assets. *See Escobedo v. Applebees*, 787 F.3d 1226, 1234 (9th Cir. 2015). Prisoners seeking to establish an inability to pay must also submit a

---

[1] In cases filed before December 1, 2023, civil litigants were required to pay an administrative fee of $52 in addition to the $350 filing fee. *See* 28 U.S.C. § 1914(a) (Judicial Conference Schedule of Fees, District Court Misc. Fee Schedule, § 14 (eff. Dec. 1, 2021)). The additional $52 administrative fee does not apply to persons granted leave to proceed IFP. *Id*.

"certified copy of the [prisoner's] trust fund account statement (or institutional equivalent) for . . . the 6-month period immediately preceding the filing of the complaint." 28 U.S.C. § 1915(a)(2). From the certified trust account statement, the Court assesses an initial payment of 20% of (a) the average monthly deposits in the account for the past six months, or (b) the average monthly balance in the account for the past six months, whichever is greater, unless the prisoner has no assets. *See* 28 U.S.C. §§ 1915(b)(1) & (4). Prisoners who proceed IFP must repay the $350 statutory fee in installments regardless of whether their action is ultimately dismissed. 28 U.S.C. § 1915(b)(2); *Bruce v. Samuels*, 577 U.S. 82, 84 (2016).

With his motion, Gonzales provided a copy of his prison certificate and trust account statement. (ECF 2, at 4–5.) During the six months before filing suit, Gonzales had an average monthly balance of $4.65, average monthly deposits of $6.05, and an available account balance of $16.46 at the time he filed suit. (*Id.* at 4.) Gonzales has established an inability to pay the required $350 filing fee, and the Court grants his IFP motion. While the Court assesses no initial payment, Gonzales must pay the full $350 filing fee in installments as set forth in 28 U.S.C. § 1915(b)(2).

## SCREENING

### A. Legal Standards

The Court must screen Gonzales's complaint and dismiss it to the extent that it is frivolous, malicious, fails to state a claim, or seeks damages from defendants who are immune. *See* 28 U.S.C. § 1915(e)(2)(B) and § 1915A(b). "The standard for determining whether Plaintiff has failed to state a claim upon which relief can be granted under § 1915(e)(2)(B)(ii) is the same as the Federal Rule of Civil Procedure 12(b)(6) standard for failure to state a claim." *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012). That is, a complaint must "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).

B.     Gonzales's Allegations

Gonzales sets forth detailed allegations about how, in different incidents, prison officials were deliberately indifferent to his medical needs and used excessive force against him. Specifically, Gonzales explains that he was given gabapentin to control seizures and pain resulting from a gunshot wound to his head. (ECF 1, at 5.) Hoping to gain entry to a "substance abuse group" (a parole-board requirement), Gonzales asked defendant Dr. Sedighi to prescribe him suboxone. (*Id.* at 8.) Sedighi said he could only prescribe suboxone if Gonzales turned in a "dirty drug test." (*Id.*) Sedighi assured Gonzales he would not discontinue Gonzales's pain medication if he did so, but when Gonzales turned in the "dirty" test, Sedighi stopped Gonzales's gabapentin. (*Id.*) When Gonzales protested, Sedighi purportedly said that he did not care if discontinuing that medication put Gonzales's "life at risk" or if he "suffered permanent injury" as a result. (*Id.* at 6.) Sedighi also allegedly said "he did not care if [Gonzales] died" "and that hopefully [he would] die while having a seizure." (*Id.* at 7.) Sedighi refused to prescribe any other pain medication for Gonzales and told him that he would be serving his "life term in severe pain." (*Id.*)

In a separate event, Gonzales went to the prison medical clinic where he told an unidentified nurse—with his lips still bleeding from "a prior seizure"—that he was having "symptoms of a possible seizure occurring" and needed to see a doctor. (ECF 1, at 9.) The nurse summoned defendant Officer Ramos, who was assigned as "security for medical staff," and Gonzales repeated his plea. (*Id.* at 9, 11.) Ramos in turn relayed the story to defendant Nurse Varajas. (*Id.* at 9.) Rather than examine Gonzales, Nurse Varajas told Ramos to have Gonzales return to his housing unit and come back the next day. (*Id.*) On the way back to his cell, Gonzales collapsed from a seizure, hit his head on the pavement, and injured his neck. (*Id.*)

The next day, while inside his cell, Gonzales began yelling "Man down!" "for about 10 minutes" because he was again having symptoms of a possible seizure. (ECF 1, at 11–12.) Defendant Officer Costa yelled "Shut up!" at Gonzales. (*Id.* at 12.) Later, Costa

found Gonzales unresponsive and called for medical assistance. (*Id.*) Gonzales claims he had suffered a seizure, collapsed, and hit his head on the sink. (*Id.*)

Some days later, defendant Officer Kies was escorting Gonzales to the Triage Treatment Area when Gonzales had a seizure. (ECF 1, at 12–13.) Kies did not call for medical assistance and instead waited until the seizure passed before continuing to escort Gonzales. (*Id.* at 13.) Gonzales then had a second seizure, and Kies again waited until the seizure passed before resuming their journey. (*Id.*)

Finally, on yet another day, Gonzales again began yelling "Man down!" in his cell. (ECF 1, at 13.) Defendant Officers Juarez and Sanderson ignored him for an unspecified time before responding. (*Id.* at 14.) When the officers arrived, Gonzales was having a seizure. (*Id.*) Juarez punched Gonzales "twice in the chest," which "could have killed" Gonzales, while Sanderson and another officer stood by. (*Id.* at 14–15, 18–20.) According to Gonzales, Juarez was "thinking" the punching "would cause [Gonzales] to come out of the seizure." (*Id.* at 14.)

## C. Discussion

### 1. *Deliberate Indifference*

Gonzales alleges that defendants violated his Eighth Amendment rights through their deliberate indifference to his serious medical needs. To state such a claim, an inmate must sufficiently allege: (1) "the existence of a serious medical need" and (2) the prison official's "deliberate indifference" to that need. *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014). Officials are deliberately indifferent when they "know[] of and disregard[] an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. For deliberate indifference based on mere delay of treatment, "the prisoner must show that the delay caused 'significant harm and that defendants should have known this to be the case.'" *Lewis v. Velasquez-Miranda*, No. 1:21-cv-00188-SAB (PC), 2021 WL 9409778,

at *4 (E.D. Cal. Apr. 12, 2021) (quoting *Hallett v. Morgan*, 296 F.3d 732, 745–46 (9th Cir. 2002)).

   a. *Dr. Sedighi*

Gonzales has stated an Eighth Amendment claim against defendant Dr. Sedighi. Gonzales says that Sedighi knew gabapentin alleviated his seizures as well as the continuing pain resulting from a past gunshot wound to his head. (ECF 1, at 5.) Objectively, Gonzales's condition was sufficiently "serious," since failing to treat it could result in both "significant injury" and "the unnecessary and wanton infliction of pain." *See Peralta*, 744 F.3d at 1086. As for the deliberate-indifference requirement, Sedighi allegedly told Gonzales he did not care if Gonzales "died" or "injured [him]self" from the seizures and nerve impairment and that he would be "doing this life term in severe pain." (ECF 1, at 7.) According to the complaint, Sedighi knew that other pain relievers such as Tylenol or nonsteroidal anti-inflammatory medications would not relieve Gonzales's pain because it stemmed from "nerve damage." (*Id.*) Despite this knowledge, Sedighi stopped the gabapentin prescription and said "he [would] not prescribe *any* nerve damage pain medication." (*Id.* (emphasis added).) These allegations plausibly suggest that Sedighi knew of an excessive risk to Gonzales's health and safety and chose to disregard it. *See Fowler v. Daniels*, No. 2:22-cv-00195-MMD-CLB, 2022 WL 20622505, at *4 (D. Nev. July 15, 2022) (concluding that doctor's abrupt withdrawal "without any precipitating event" of gabapentin, which had "proved highly effective at treating" plaintiff's seizures and pain, stated a claim "for deliberate indifference to serious medical needs"); *Gray v. Khoo*, No. 1:20-cv-01407-DAD-SAB (PC), 2021 WL 38182, at *9–10 (E.D. Cal. 2021) (finding allegations that doctor "discontinued Gabapentin with no systemic replacement" and "denied all pain management" sufficient to state an Eighth Amendment claim), *report and recommendation adopted in part*, No. 1:20-cv-01047-DAD-SAB (PC), 2021 WL 532358 (Feb. 21, 2021).

5

b. *Costa*

Gonzales has also sufficiently alleged that Officer Costa violated his Eighth Amendment rights based on Costa's alleged delay in summoning medical assistance. To make out such a theory, "the prisoner must show that the delay led to further harm." *Goldyn v. Angelone*, No. 97-17185, 1999 WL 728561, at *1 (9th Cir. Sept. 13, 1999); *see also Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam) (holding that when "mere delay" is alleged, there is "no claim for deliberate medical indifference unless the denial was harmful").

Gonzales yelled "Man down!" from his cell "for about 10 minutes" because he had "symptoms of a possible seizure occurring." (ECF 1, at 12.) Instead of responding to this possible medical emergency, Costa told Gonzales to "shut up" and ignored him. (*Id.*) While failing to "immediately respond to a 'man down' call alone is insufficient to state a plausible claim of deliberate indifference," *Turley v. Lezano*, No. 3:22-cv-1719-GPC-DDL, 2023 WL 2705841, at *3 (S.D. Cal. Mar. 28, 2023), the 10-minute delay here plausibly led to further harm. That is, Gonzales subsequently suffered a seizure, collapsed, and hit his head on the sink. (ECF 1, at 12.) Costa later discovered Gonzales unresponsive in his cell and only then called for medical help. (*Id.*) These allegations sufficiently establish that Costa knew of and "disregard[ed] an excessive risk to [Gonzales's] health or safety," *see Farmer*, 511 U.S. at 834, and Costa's failure to summon medical assistance plausibly resulted in "further harm" when Gonzales later seized and struck his head on the sink, *see Goldyn*, 1999 WL 728561, at *1.

c. *Kies*

Gonzales states a claim against officer Kies. While Kies was escorting him to the Triage Treatment Area, Gonzales had a seizure. (ECF 1, at 13.) Rather than call for "an Emergency Transport Vehicle," which Gonzales claims "is the normal procedure when an inmate has a medical emergency," Kies waited until the seizure was over and then merely resumed his "medical escort." (*Id.*) Gonzales alleges that Kies's "forc[ing] him to walk the rest of the way" caused him "to have a second seizure." (*Id.*) Even after witnessing the

second episode, Kies made him "continue to walk" rather than summoning transport. (*Id.*) These allegations plausibly demonstrate that Kies knew Gonzales had "serious medical needs" that "could result in further significant injury" or "the unnecessary and wanton infliction of pain"—but that he disregarded this "excessive risk to inmate health" in a display of deliberate indifference. *Colwell*, 763 F.3d at 1066.

    d. *Varajas and Ramos*

Gonzales states a claim against both Nurse Varajas and Officer Ramos. According to his complaint, Gonzales "went to the medical clinic" and reported to an unidentified nurse that he "had a prior seizure which is why [his] lips were bleeding," and requested to see a doctor because he "was having symptoms of a possible seizure." (ECF 1, at 9.) The nurse summoned Officer Ramos, who was on scene "as security for medical staff" and to whom Gonzales repeated his request. (*Id.* at 9, 11.) Ramos in turn "went inside the clinic and communicated this to Nurse Varajas." (*Id.* at 9.) When Ramos finally returned, he relayed to Gonzales that the nurse said "to send [plaintiff] back to [his] cell/housing unit and come back tomorrow." (*Id.*) On his way back to his cell, Gonzales had a seizure that caused him to "hit [his] head on the pavement" and injure his neck. (*Id.*)

Nurse Varajas's purported refusal to respond to Gonzales's reported symptoms of an oncoming seizure—or even to investigate his claims with a brief examination—supports a deliberate-indifference claim. As a trained professional, Varajas plausibly drew "the inference" "that a substantial risk of serious harm" existed, but disregarded it and delayed his treatment. *See Farmer*, 511 U.S. at 834. Gonzales's subsequent injuries, sustained during the ensuing seizure, constitute the requisite further harm.

With Officer Ramos, the case is less clear-cut. Gonzales, with his lips still bleeding from "a prior seizure," told Ramos that he "was having symptoms of a possible seizure" and needed "to see the doctor." (ECF 1, at 9.) Ramos "went inside the clinic and communicated this to Nurse Varajas." (*Id.*) Apparently without ever leaving the clinic to examine Gonzales, Nurse Varajas allegedly directed that he be sent away without any treatment. (*Id.*) A factfinder could plausibly conclude that Ramos failed to object to this

cursory dismissal, failed to insist that some health-care professional examine the patient in person, and failed to ensure that Gonzales "received at least facially adequate medical care." *See Austin v. Cnty. of Alameda*, No. C-15-0942 EMC, 2015 WL 3833239, at *7 (N.D. Cal. June 19, 2015). It is plausible that Ramos—viewing Gonzales's bloodied lips and hearing his request for help—understood that "failure to treat [the] condition could result in further significant injury." *See Peralta*, 744 F.3d at 1086.

"Prison officials who are not trained medical professionals are entitled to rely on the treatment chosen by the prison doctors, *unless the inadequacy of the treatment is obvious to a lay person.*" *Pabon v. Ryan*, No. 05-cv-0283-LAB-CAB, 2007 WL 2404294, at *10 (S.D. Cal. Aug. 19, 2007) (emphasis added). Put another way, non-medical personnel may rely on the medical opinions of health-care professionals unless "they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013) (cleaned up). It is plausible that a lay person, seeing Gonzales's physical state and hearing his warning of another impending seizure, would find that summarily sending him away without even an examination constituted an inadequate medical response. Viewing these allegations in the light most favorable to plaintiff, Gonzales states deliberate indifference against Ramos.

e. *Juarez and Sanderson*

Gonzales states deliberate-indifference claims against both Juarez and Sanderson. The officers allegedly "ignored" Gonzales's calls of "man down" "even after [he] told them [he was] having a seizure." (ECF 1, at 13–14.) Confusingly, Gonzales alleges that at the very same moment—June 21, 2022, at about 17:40 hours—the guards *both* "failed to come assist" him *and* one of them (Juarez) responded to his pleas by punching him in the chest, "thinking this would cause [him] to come out of the seizure." (*See id.*) But even assuming there was some initial delay, no facts are alleged that indicate any "delay led to further harm." *Goldyn*, 1999 WL 728561, at *1.

Trying a more promising tack, Gonzales claims Juarez also "was deliberately indifferent to a serious medical need because" Juarez "punched [him] twice in the chest"

8

while Gonzales was seizing, which "could have killed" him. (ECF 1, at 14.) Inadequate medical treatment rising to the level of an Eighth Amendment violation need not consist solely of a "failure to respond," but also may be found in "a purposeful act," as long as there is also "harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Juarez, aware that Gonzales was seizing, punched him twice in the chest rather than summon proper medical assistance. (ECF 1, at 14.) Whatever Juarez may have been thinking, this was clearly an improper course of action that suggests an intentional indifference to the medical emergency Gonzales was experiencing. "[T]he more serious the medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those needs, the more likely it is that a plaintiff has established 'deliberate indifference' on the part of the defendant." *McGuckin v. Smith*, 974 F.2d 1050, 1061 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

Bystander Sanderson was also deliberately indifferent because, despite observing the helpless and seizing Gonzales, he "just stood there and did nothing." (ECF 1, at 15.) Over and above the seizure itself, Sanderson witnessed a fellow officer punching an incapacitated inmate, cracking the inmate's ribs and compounding his already acute medical distress. Gonzales exhibited "serious medical needs" that could lead to his "significant injury," yet Sanderson allegedly stood idly by and disregarded an "excessive risk to inmate health." *See Colwell*, 763 F.3d at 1066.

f. *Madden, Roberts, and Gates*

Gonzales fails to state a claim against three supervisors: Warden Madden, Chief Medical Executive Roberts, and Chief of Inmate Health Care Appeals Gates. (*See* ECF 1, at 2.) To state a § 1983 claim, a plaintiff must allege how "each Government-official defendant, through the official's own individual actions" violated his constitutional rights. *See Iqbal*, 556 U.S. at 676–77. A supervisor may be liable under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the

constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). Yet Gonzales makes only broad and conclusory allegations about defendants "not properly training [their] employees." (*See* ECF 1, at 15–16.) There are no specific factual allegations about what any of these defendants did or failed to do that violated his constitutional rights or the role any played in his medical care. Gonzales thus fails to state a plausible claim for § 1983 relief as to these supervisors.

### 2. *Excessive Force*

The "unnecessary and wanton infliction of pain" by prison officials applying "excessive physical force" can violate the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 5–7 (1992). "[T]he core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 7.

According to the complaint, Officer Juarez used unconstitutionally excessive force when he punched Gonzales in the chest—"crack[ing]" his ribs—while Gonzales was helpless and having a seizure. (ECF 1, at 18.) As alleged, a factfinder could plausibly find that bludgeoning an inmate during his seizure was not a good-faith attempt to restore order and instead was done maliciously and sadistically to cause harm. Of course, Gonzales alleges that Officer Juarez was "thinking" the punching would somehow cure the seizure. (*See id*. at 14.) It is not clear what Gonzales's basis of knowledge would be for Juarez's state of mind. Even assuming Juarez told Gonzales that he cracked his ribs in order to aid him somehow, a factfinder could plausibly find that this excuse defied credulity. At the pleading stage, then, Gonzales has alleged an Eighth Amendment excessive-force violation against Juarez.

Gonzales levels the same excessive-force claim against Sanderson and Doe 1, accusing them of having "condoned" the beating. (ECF 1, at 19.) "Officers can be held liable for failing to intercede in situations where excessive force is claimed to be employed by other officers," *Hughes*, 31 F.4th at 1223, so long as they had a "realistic opportunity" to intercede, *Cunningham v. Gates*, 229 F.3d 1271, 1290 (9th Cir. 2000). Gonzales claims

this very thing: "[Sanderson] should [have] told [] Juarez not to punch me again. Instead, [] Juarez punched me in the chest a second time while I was having a seizure while [] Sanderson just stood there and did nothing." (ECF 1, at 14–15.) Viewed in the light most favorable to Gonzales, his allegations suggest that Doe 1, also present, had enough time to intercede as well. (*See id.* at 19–20.) Gonzales thus states a claim against both Sanderson and Doe 1 for their failure to intervene in the use of excessive force.

**D.    Leave to Amend**

"A district court should not dismiss a pro se complaint without leave to amend unless it is absolutely clear that the deficiencies of the complaint could not be cured by amendment." *Rosati v. Igbinoso*, 791 F.3d 1037, 1039 (9th Cir. 2015) (quotation marks omitted). If Gonzales desires, he may amend his complaint to correct the deficiencies identified in this order.

## OTHER MOTIONS

Gonzales moves to have his "correct last name" "be the name documented in the case file" because it was initially misspelled on the docket as "Gonsales." (*See* ECF 4.) The motion is denied as moot because Gonzales's name is now correctly spelled on the Court's docket. But the Court grants Gonzales's motion for leave to file excess pages beyond the 22-page limit specified by General Order 653. (*See* ECF 5.)

## CONCLUSION

Accordingly, the Court:

1.    **GRANTS** Gonzales's motion to proceed IFP.

2.    **DIRECTS** the Secretary of the CDCR, or that official's designee, to collect from plaintiff's trust account the $350 filing fee owed in this case by garnishing monthly payments from his account in an amount equal to 20 percent of the preceding month's income and forwarding those payments to the Clerk of the Court each time the amount in plaintiff's account exceeds $10. All payments must be clearly identified by the name and number assigned to this action.

3. **DIRECTS** the Clerk of the Court to serve a copy of this Order on Jeff Macomber, Secretary, CDCR, P.O. Box 942883, Sacramento, California, 94283-0001.

4. **DENIES AS MOOT** Gonzales's motion to correct name (ECF 4) and **DIRECTS** the Clerk to mail Gonzales a copy of the docket.

5. **GRANTS** Gonzales's motion for leave to file excess pages (ECF 5).

6. **DISMISSES WITHOUT PREJUDICE** (and with leave to amend) Gonzales's Eighth Amendment deliberate-indifference claims against defendants Madden, Gates, and Roberts for failing to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) and § 1915A(b)(1).

7. **GRANTS** Gonzales until October 15, 2024, to either: (a) file a Notice of Intent to Proceed with his claims against defendants Sedighi, Costa, Kies, Varajas, Ramos, Juarez, Sanderson, and Doe 1 *only*; or (b) file an amended complaint that attempts to correct the deficiencies noted in this order.

If Gonzales timely files a Notice of Intent to Proceed, the Clerk will issue an order directing the U.S. Marshal to effect service of the complaint on defendants Sedighi, Costa, Kies, Varajas, Ramos, Juarez, Sanderson, and (if identified) Doe 1.

If Gonzales instead timely files an amended complaint, that new complaint must be complete in itself without referring to any previous version. *See* CivLR 15.1; *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 928 (9th Cir. 2012) (noting that claims dismissed with leave to amend that are not re-alleged in an amended pleading may be "considered waived if not repled"). It must be entitled "First Amended Complaint," contain "S.D. Cal. Civil Case No. 23-cv-02181-AGS-BJC" in its caption, and comply with Federal Rule of Civil Procedure 8 and Southern District of California Civil Local Rules 8.2(a) and 15.1(a).

If Gonzales chooses to do neither by October 15, 2024, the Court may enter a final order dismissing this case, based both on his failure to state a claim and his failure to prosecute in compliance with a court order requiring amendment. "If a plaintiff does not take advantage of the opportunity to fix his complaint, a district court may convert the

dismissal of the complaint into dismissal of the entire action." *Lira v. Herrera*, 427 F.3d 1164, 1169 (9th Cir. 2005).

Dated:  August 16, 2024

_____
Andrew G. Schopler
United States District Judge